# EXHIBIT D

***JAMIS COMPANIES***

***VS.***

***OWNERS INSURANCE COMPANY***

**Deposition**

***CHRIS JOHNSON***

*06/01/2020*

---

***AB Court Reporting & Video***
*216 16th Street, Suite 600*
*Denver Colorado, 80202*
*303-296-0017*

the past. Is that correct?
A Yes, I have.
Q Okay. I'm not going to spend much time then going over deposition rules and that sort of thing, but if for some reason you can't hear me or we cut out because we're on Zoom, please just met me know, and I'll reask the question. All right?
A Sure.
Q Mr. Johnson, is there any reason you can't testify today and provide full and accurate testimony?
A None that I'm aware of.
Q Fair enough. Mr. Johnson, did you do anything to prepare for your deposition today?
A I reviewed the documents on your exhibit list and made copies of most of them and have those with me today.
Q Okay. Thank you.
Mr. Johnson, what's your current address?
A 318 South Broadly Road, Columbus, Ohio 43209.
Q And could you also just state your full name for the record, please?
A Chris Alan Johnson.
Q Mr. Johnson, have you ever lived in

information on that case if you'd like that. I don't know why I didn't include that one on this list.

Q Did you provide testimony in that case?

A Just through an affidavit.

Q Okay. Well, if you do have any supplements to this, we would appreciate getting a copy of that through your counsel.

Mr. Johnson, I also see in 2018 there was a Hoskins versus Auto-Owners Insurance Company case. Do you see that?

A Yes.

Q What did that case involve?

A I don't remember -- I don't remember the facts of that case. I was representing the plaintiff in that case, and I don't recall now what the details of that claim was.

Q Okay. That's fine.

Mr. Johnson, looking at the materials you've reviewed in this case, you haven't reviewed a copy of Jamis's 30(b)(6) deposition. Is that right?

A I have not.

Q Mr. Johnson, let's back up for a minute. I've got your C.V., obviously, but can you just briefly describe for me the education you've received after graduating from high school?

all 50 states.
Q Did your time at Nationwide involve commercial property claims?
A Through the reinsurance aspect of it, it did.
Q Can you expand on that a little bit more for us, just give us an example of the sort of things you might be dealing with while you were at Nationwide with respect to commercial property?
A Sure. The commercial property book of reinsurance that Nationwide wrote would provide coverage for -- to insurance companies for any catastrophe that might be designated that might reach the reinsurance retention cover, and so those claims would come through. They would be submitted typically with a copy of the commercial property coverage forms just for the record for our review and just to make sure that the underlying insurance company was following the terms and provisions of the insurance policy.
Q Did your commercial property experience involve weather-related claims aside from pollution?
A Yes. I mean, the -- there was two aspects. There was two sides: the property side and the casualty side. The casualty side was involving

the pollution. The property side typically was triggered by either a large boiler claim or a large fire loss or a catastrophe loss like a hurricane or Midwest hailstorms. So anything that could be aggregated into a reinsurance claim for reinsurance protection.

Q Sure. Do you recall dealing with any claims arising or involving -- let me strike that.

While you were at Nationwide, Mr. Johnson, do you recall dealing with any Colorado claims?

A Not specifically, no.

Q What about after that with respect to your future employment? Do you recall dealing with any claims in Colorado during your work at those companies?

A Well, with Cincinnati Insurance and with State Auto Insurance, I recall there being connections with claims out in Colorado. I recall them generally. There were some hail damage claims. I don't recall any specifics. I didn't -- wouldn't have handled those claims directly. I would have either handled them through an independent adjuster or as the consulting in-house lawyer at State Auto.

Q Can you expand on what you said about using an independent adjuster a little bit and give

us an idea of how that would work?

A If we would have had an insured with Cincinnati that -- where we needed to have an adjuster on the ground out in Colorado, or, frankly, any state where we didn't have a resident adjuster, we would contact an independent adjuster to assist us with handling the claim.

Q And you would agree it's common for insurance companies to use independent adjusters, or IA's, when investigating insurance claims?

A Sure.

Q After your time at Nationwide, Mr. Johnson, it looks like you moved on to State Auto Insurance Company. Is that right?

A That's correct.

Q And what sort of work were you doing at State Auto?

A I was the corporate claims counsel, in-house counsel for State Auto, providing legal opinions, legal review, of State Auto's book of claims that would come in, so was accessible by all of the regional offices plus the staff or home office claims examiners for claims consultation, legal opinion, those types of things.

Also I managed all of the company's

extracontractual claims as far as anytime State Auto was sued, if it included a claim for bad faith, extracontractual damages, a violation of unfair state practices acts, those would come to my attention for handling.

Q And you were involved in providing coverage opinions while you were at State Auto?

A That's correct.

Q You also mentioned that you managed extracontractual claims while you were at State Auto. Were those claims arising in Ohio, or were they in other states as well?

A All states. All states where we would receive a claim of that nature.

Q Did State Auto write insurance in Colorado?

A I recall that we wrote out in Colorado. I can't recall the specifics now, but I believe that was one of the states that State Auto was writing in at the time.

Q While you were at State Auto, do you recall dealing with any property claims in Colorado?

A On a general basis I -- nothing specific. Nothing comes to mind. But that wouldn't have been unusual for me to address a property issue if it came

self-insured retention, or there may have been another carrier involved at a lower level in the insurance tower.

Q I know we've kind of walked through your employment from Cincinnati to Nationwide to State Auto to Excel. Other than those four positions, have you worked for any other insurance companies?

A No.

Q In thinking about your time at those companies, and I recognize it spans a number of years, but did you ever travel to Colorado in connection with a claim?

A I don't recall ever traveling to Colorado for a claim, no.

Q Can you recall any specific claim involving property in Colorado that you dealt with during your work at any of those companies?

A No specific -- no specific claim. There may have been a couple of hazardous waste sites out in the Colorado area. Those seemed to come to mind as we were talking about my work with Nationwide Insurance, but I'd have to do some research to follow up with you on that.

Q And then it looks like after Excel Insurance Company you formed Highbanks Insurance

business because we don't share that information, but for my book of business that I do, I've worked with both plaintiffs' lawyers and defense firms being requested to be retained for claims reviews, for coverage opinions, for addressing any issues regarding good faith claims handling.

The split of my book right now, if I counted all of the times I've been called and have talked to people, it's probably 60 percent plaintiff-related, maybe a little more or a little less depending on which year we look at, and 40 percent defense-related.

Q Have you ever been retained by a defense firm or an insurance company in Colorado?

A No, sir.

Q Have you ever been retained to provide work or services for Owners Insurance Company or Auto-Owners insurance company?

A Not that I recall.

Q Mr. Johnson, how did you get involved with cases in Colorado? I see on your C.V. most of your work has been in Ohio. Is that fair?

A Yes, probably 80 percent has been in Ohio.

Q How did you first get involved in litigation in Colorado?

A I received a call from the Furtado law firm. I believe it was a referral from Britta Moss, my colleague.
Q Who called you from the Furtado law firm?
A Since it's been a couple of years, I don't recall exactly who it was. It might have been Rodney Monheit. I'm not sure that he's still with the firm.
Q Sure. Have you worked with other plaintiffs' firms in Colorado other than the Furtado firm?
A No, sir.
Q How many cases have been -- have you been retained by the Furtado firm on?
A I received a couple of cases earlier this year. I would say five.
Q Mr. Johnson, you talked to us before about some of your employment history, obviously, some of which was related to reinsurance issues. Do you have any experience actually being a claims handler for a commercial property claim?
A Yes, sir.
Q Okay. Can you describe that for us?
A While I was with Cincinnati Insurance, during my six and a half years with Cincinnati Insurance, I handled a number of commercial property

losses as part of my field claims representative duties.

Q But none of those were Colorado properties, true?

A That's true.

Q And, Mr. Johnson, you've never worked for an insurance company in Colorado, correct?

A No.

Q So that is correct? I just want to make sure we're avoiding a double negative there.

A No, we -- I have never done any work as an expert witness on behalf of an insurance company in Colorado.

Q And you've never -- let's put the expert witness work aside. You've never worked as an employee for an insurance company in Colorado either, correct?

A That's correct.

Q Let's go back to your education for a minute. Are you still a licensed attorney in Ohio?

A Yes.

Q Are you licensed in any other states?

A No, sir.

Q You've never been a licensed attorney in Colorado?

A No, sir.

Q As part of your education, including continuing legal education, have you done any education specific to claims handling in Colorado?

A Not that I recall. Not like a Colorado continuing legal education course or -- no, sir.

Q Have you ever had your expert testimony or opinions limited by a court or excluded by a court?

A No, sir.

Q Mr. Johnson, have you ever been qualified as an expert in United States District Court for Colorado?

A When you say "qualified," I guess I'm not sure what you mean by that.

Q Sure. That's a fair question. Let me ask you a better one.

Have you ever testified in a trial in U.S. District Court for the District of Colorado as an expert?

A No, sir.

Q Have you ever testified as an expert in Colorado state court?

A No, sir.

Excuse me. Actually, there was one case where I provided deposition testimony as -- I don't

wouldn't have included that information, but that was just recently that I invoiced this claim.

Q Are you billing by the hour for this claim?

A Yes.

Q And how many hours have you spent working on this case?

A I'd have to check my invoice. I probably had 12 to 14, maybe 15 hours on this case.

Q But you say you've recently sent an invoice that should have that information?

A Yes.

Q You've never talked with anyone directly from Jamis. Is that right?

A No.

Q You've never spoken to Mr. Soneff before, true?

A That's correct.

Q And you've never visited the property at issue in this case, true?

A That's true.

Q Let's -- I should say first, Mr. Johnson, if you need a break at any point, just let us know.

A Okay.

Q We're not going to be going an incredibly

handling of the insurer and whether or not they were done and caused any significant delays in the payment of benefits or the acknowledgment of benefits to Jamis. I'm not a building code expert or a construction expert, but I am aware of what was going on in the claim and what was taking place with regard to the building code issue.

I have the City of Lakewood building permit process. Apparently they provide an assistant -- an assistance handout. That's not one of your documents that you had on your exhibit list, but I can give you the Bates stamp number. And this has a number of -- the indications are in here with regard to what the City of Lakewood requires, and I believe that's incorporated in there, is the International Building Code, and I can't remember the number, but there's a number that goes along with that.

Q And what's the Bates label for the document you were just referring to?

A It's Auto-Jamis 000410.

Q Thank you, Mr. Johnson. Let me try to ask you a better question.

What I'm trying to figure out is, is as a part of your work did you actually review the code

and make a determination about whether, for example, the Lakewood Building Code that was in effect at the time of the loss would require a complete reroof of Jamis's property? Is that something you did?

A Not independent of what ECO and -- the explanation provided by ECO and the other indications in the UBC -- I believe it's UBC -- the other roofer, indicating that there were code updates that needed to be done.

I reviewed the e-mails going back and forth between Owners and I believe her name was Bree of ECO, and so there were a number of communications going back and forth, and these regulations were being reviewed.

It didn't appear to me that -- from the claim file that Owners was disputing what the code said, just whether or not the code was applicable to this particular claim, and it appeared to me that it was applicable to the claim because of the indications in the e-mails going back and forth.

Q You're aware that there was a dispute with respect to various communications with the building department about whether a complete reroof would be required, correct?

A I recall the e-mail traffic that was going

coverage under the policy.

Q Is there a distinction between a regular delay and a significant delay?

A Well, I would say anything less than 30 days is probably acceptable as far as getting a claim moving if proceeds are owed -- due and owing under the policy. But we're not just talking about delays, we're talking about -- unreasonable delays; we're also talking about unreasonable denials of coverage.

Q Okay. I want to break down a couple of things you just mentioned. What is the basis for your opinion that a 30-day delay is unreasonable?

A No, I said anything within 30 days.

I'm basing it on my experience in the claims and insurance industry in what I believe are the practices, standards and customs of the -- of the insurance industry with regard to claims.

Q Have you ever consulted with anybody in the Colorado insurance industry with respect to what's reasonable in terms of handling insurance claims?

A No.

Q Are you familiar with the Colorado insurance regulations that govern the timing of handling insurance claims?

A I've reviewed the Colorado regulations, yes. I have reviewed those before.
Q Which sections did you review?
A Well, the sections with regard to -- that I believe are specifically at play here are quoted in my -- quoted in my report. I don't require the -- recall the exact number.
Q Well, let's be specific. Your report talks about a couple of statutes in Colorado, including sections 10-3-1113, 10-3-1115 and 1116. Those are Colorado Revised Statutes.
Are you familiar, sir, with the Colorado insurance regulations that govern the timing and handling of insurance claims?
A Yes, I've reviewed those. I would need to refresh my recollection with regard to what they exactly say.
Q When is the last time you reviewed those?
A Probably a year ago.
Q You didn't review them in connection with this case, correct?
A I don't -- no.
Q Those regulations aren't -- let me strike that.
The regulations that you reviewed are not

done and to comply with the code.

Q You're not a cost of repair expert, correct?

A That's correct.

Q And you're not a construction expert?

A No.

Q You're not a roofing expert?

A No, sir.

Q You testified that it looked like the estimates were reasoned. What did you mean by that?

A They provided a lot of itemization, they provided notations on where -- the reasoning for the code updates. And this was also backed up by the e-mail exchanges from Bree to Owners trying to explain what the foundation of the estimates were. I believe also -- in addition to the code updates, there was other reasoning for the repair type that ECO was suggesting to the roof with regard to further problems that were going to be realized if the roof wasn't repaired correctly.

Q You mentioned that the estimates were consistent. Let's just be clear on that. You're saying that the Pivot estimate and the ECO estimates are generally consistent?

A I believe, or they're close in number. I

be a long answer, but I'll try to summarize.

My 35-plus years of experience in the insurance claims and legal industry has allowed me to experience and review claims file procedures, claims procedures, claims manuals. I have drafted claims policies and claims manuals. I have reviewed them, edited them. So for policies and procedures in-house at an insurance company, I'm very familiar with the different types of claims handler guidelines that are out there and the consistency of claims handling practices that insurance companies employ.

The other aspect of this is I have reference manuals with regard to claims handling and good faith claims handling that I consult with on a -- whether or not claims handling is in good faith, what the claim standards and practices are.

The other aspect of this is I've had a chance over my career to review various states' both statutory and administrative law code sections with regard to good faith claims handling, Fair Claims Practices Act, and that includes probably over 25 states that I have had the chance to review those laws over the years.

So when I talk about my experience with insurance industry practices, standards and customs,

that's really what I'm referring to, is a large global understanding of those items.

Q And let's go back to your reference to reference manuals. You don't reference any of those manuals in your report in this case, correct?

A No, sir.

Q Did you consult any reference manuals during your work on this case?

A I don't recall specifically, although it's a claims manual that I refer -- reference -- or consult with on a -- on a fairly frequent basis in the course of my work.

Q Which manual is that?

A Hold on.

There are two manuals, and I'm trying to locate them now. Hold on just a second.

Sir, I'll have to supplement that answer because I don't have them with me right now. They are training -- claims training manuals for claims professionals, and they are published by the claims training organization out of Malvern, Pennsylvania. And these are recognized experts in the field of insurance claims that have published these books. And -- but right now the name is escaping me on who published that.