# EXHIBIT B
# JS HELD REPORT

EXHIBIT A

February 28, 2020

Adam P. O'Brien, Esq.
Wells, Anderson & Race, LLC
1700 Broadway, Suite 1020
Denver, Colorado 80209

Re: **Evaluation of Alleged Hailstone Impact Damage**

| | |
|---|---|
| File Name: | Jamis Companies, Inc. v. Owners Insurance Company |
| Case No.: | 1:19-cv-1768-SKC<br>The United States District Court for the District of Colorado |
| Address: | 775 Sheridan Boulevard, Lakewood, Colorado 80214 |
| Date of Loss: | May 8, 2017 |
| J.S. Held Job No.: | 20010338 |
| WAR File No.: | 352-100 |

Mr. O'Brien:

At your request, J.S. Held, LLC (J.S. Held) conducted an evaluation of the Jamis Companies, Inc. (Jamis) commercial property located at 775 Sheridan Boulevard in Lakewood, Colorado. It is our understanding the property owner, Jamis, filed an insurance claim related to a hailstorm event that reportedly occurred on May 8, 2017. Following the hailstorm event, Jamis contacted their insurance carrier, who, through Catastrophe Specialist, Inc. (CSI), an independent adjuster, conducted their evaluation of the Jamis property on May 15, 2017. CSI's initial repair estimate totaled $16,934 and generally included the following:

1. Replacement of the roof drip edge flashing.
2. The metal fascia panel (painting on east side, and replacement north, west, and south sides).
3. Cleaning and painting the exterior walls, trim, and doors (east and south sides).
4. Replacement of overhead door weatherstripping (south).
5. Replacement and painting of hardiboard siding (west attached shed).
6. Replacement of the modified bitumen roof at the mechanical housing.
7. Replacement of the asphalt composition shingles at the attached shed.
8. Replacement of the lighted monument sign on the Sheridan Boulevard.
9. Re-glaze one single-pane window (south).
10. Miscellaneous repairs to electrical outlets, communication speakers, and exterior lighting.

The property owner also contacted their preferred roof maintenance/repair contractor, UB Code Roofing, who conducted an evaluation of the roof and estimated full replacement of the roof covering on January 10, 2018, for $24,239. UB Code Roofing's estimate generally included removal and replacement of the following:

1. The ethylene propylene diene terpolymer (EPDM) roof membrane.
2. The roof drip edge flashing.
3. The asphalt composition shingles on the attached shed structure.
4. The modified bitumen on the rooftop mechanical housing.
5. The corrugated metal at the exhaust vent.
6. Add one-inch thick rigid foam insulation under the new EPDM roof membrane.

It is our understanding Owners Insurance Co. issued two checks to Jamis totaling $14,695; however, as of the date of this report, no repairs have been conducted at the Jamis property to address damage reportedly created by hailstone impacts on May 8, 2017. Subsequent to the evaluation and initial cost of repair estimate provided by UB Code Roofing, the property owner, through other representatives, submitted a variety of supplemental cost of repairs to Owners Insurance Co., (discussed later in this report) including:

- The March 21, 2018 estimate from ECO Roof and Solar for $126,383.25
- The March 28, 2018 estimate from ECO Roof and Solar for $105,259.28
- The April 30, 2019 estimate from Pivot Adjusters for $136,167.73

The Complaint alleged several components of Owner's evaluation and proposed repairs did not meet construction industry standards, did not provide a repairable construction process, were not approved by roof membrane manufacturers, did not address the hail damaged EPDM membrane, and did not meet the requirements of the applicable building code. The Plaintiff's F.R.C.P. 26(a)(1) Amended Initial Disclosure Certificate indicated the Plaintiff seeks $364,107.16 in damages due to Owner's unreasonable delay and denial in paying to repair the property related to damages that were created on May 8, 2017.

**SCOPE**

Our scope of work included conducting an investigation to determine whether the roof covering, and various exposed exterior components of the building, were affected by hailstones on May 8, 2017, or during their service life. Additionally, we were asked to develop a scope and cost of repairs related to hailstone impact affects that would satisfy the Lakewood Building Department requirements.

**PROPERTY DESCRIPTION**

The Jamis property was a one-story commercial structure that, according to the Jefferson County Assessor's website, was originally constructed in 1958 and was 3,800 square feet in area (building and roof area). Currently, the building is being used as an auto service garage (Dents Paint & Auto Body), which faced to the east toward Sheridan Boulevard. The parcel was 12,500 square feet in area and included the structure and asphalt pavement/parking spaces on the east and south sides. The current tenant was utilizing the remaining space at the west and north sides, which were covered with gravel/rock cobble, for outside storage. A wood-framed shed was attached to the west exterior wall.

The structure was comprised of masonry load-bearing exterior walls with clay brick veneer, which was supported by a cast-in-place concrete foundation. The exterior brick walls were painted on the east and south walls and natural clay/unpainted on the west and north walls, which included a strip of aluminum metal siding located along the top of the exterior walls, the south and east sides of which were painted. Windows with painted vinyl frames were in the east exterior wall and windows with steel frames, likely original to the construction of the structure, were in the south, west, and north walls. The front door was located at the southeast corner of the building under an overhang. The south wall included three openings for overhead garage doors, one of which was covered with painted OSB wall sheathing.

The roof was a low-slope, adhered, 60 mil, thermoset/EPDM membrane that was supported by an unknown recovery board under the membrane. The roof assembly was supported by dimensional wood joists and gapped wood sheathing boards. According to the owner, the existing EPDM roof was installed in 2014.

Rooftop appurtenances included gutters on the north and west side that discharged roof drainage to the ground surface, light-gauge sheet metal vents, a sheet metal housing at the northwest corner of the roof, and a wood-framed HVAC housing with a sheet metal vent at the west side of the roof.




20.01.22 JEA 7 shows the front/east side of the building, the painted brick, and metal siding.



20.01.22 JEA 93 shows the south side of the building, overhead doors, and metal siding.



20.01.22 JEA 80 shows the west side of the building, metal siding, and the attached shed.



20.01.22 JEA 165 is a view showing the EPDM roof and rooftop appurtenances.

**DOCUMENTS REVIEWED**

Our office was provided with several documents related to our investigation, including:

1. Complaint
2. Excerpts from the AutoJamis job file, including:
    a. AUTOJAMIS 000199 – 0000204 The June 28, 2017 Summary Loss Report
    b. AUTOJAMIS 000283 – 000310 The June 28, 2017 Cost of Repair estimate prepared by Catastrophe Specialist, Inc.
    c. AUTOJAMIS 000317 – 000323 The January 10, 2018 Cost of Repair estimate prepared by UB Code Roofing
    d. AUTOJAMIS 000325 – 000341 The March 21, 2018 Cost of Repair estimate prepared by ECO Roof and Solar
    e. AUTOJAMIS 000353 – 000362 The March 28, 2018 Cost of Repair estimate prepared by ECO Roof and Solar

f. AUTOJAMIS 0004222 – 000436 various e-mails
g. AUTOJAMIS 000438 – 000447 The June 28, 2018 Cost of Repair estimate prepared by Catastrophe Specialist, Inc.
h. AUTOJAMIS 000502 - 000513 The April 10, 2019 Cost of Repair estimate prepared by UB Code Roofing

3. The January 28, 2019 Deposition Transcript of Jay Michael Soneff with Exhibits 1 through 11
4. Plaintiff's Amended Responses to Defendant Owners Insurance Company's First Set of Written Discover to Plaintiff
5. Plaintiff's F.R.C.P. 26 (a)(1) Second Supplemental Disclosure Certificate
6. Plaintiff's F.R.C.P. 26(a)(1) Third Supplemental Disclosure Certificate
7. Excerpts from the Plaintiff/Jamis job file, including:
    a. JAMIS 000179 – 000229 The April 30, 2019 Cost of Repair estimate prepared by Pivot Adjusters
    b. First Supplemental Disclosures Jamis_000230 – 000232
    c. Second Supplemental Disclosures Jamis_000233
8. The January 8, 2020 Jamis Companies, Inc. v. Owners Insurance Company report prepared by Highlands Insurance Professionals

**SITE EVALUATION**

J.S. Held conducted our initial site evaluation on Wednesday January 22, 2020. Present at the site were:

- Jeffrey E. Anderson, Architect, J.S. Held
- Drew Houser, P.E., J.S. Held (no longer employed at J.S. Held)
- Michael Jackson, P.E., J.S. Held
- Joseph Del Guidice, Director, J.S. Held
- Adam O'Brien, Attorney, Wells, Anderson & Race, LLC
- Christopher Unger, Attorney, Wells, Anderson & Race, LLC

During our site visit we were able to walk around the exterior of the structure and evaluate the roof. We did not access the interior of the building.

**APPLICABLE BUILDING CODE and CITY OF LAKEWOOD BUILDING PERMIT INFORMATION**

The Jamis property was located within the jurisdiction of the City of Lakewood Building Department. On September 1, 2018 ,the City of Lakewood adopted the 2015 International Code Council set of codes with the current City of Lakewood amendments including the Building Code (IBC), Mechanical Code (IMC), Existing Building Code (IEBC), Energy Conservation Code (IECC), among others, that are applicable to work at the property that requires a permit. Prior to September 1, 2018, the City of Lakewood Building Department had adopted the 2009 International Code Council set of codes, which would have been applicable to repairs that required a permit had they been conducted prior to that date.

On Wednesday February 19, 2020, we met with two commercial plans examiners at the City of Lakewood building department to discuss repair options at the Jamis property, what work would require a permit, if a permit was required to repair the roof, and what additional work, if any, would be triggered by the issuance of a permit. Specific to our scope of repair discussed later within this report, the City of Lakewood Building Department would require a permit for the following work:

1. A roof permit to remove and replace the drip edge flashing at the EPDM roof edge.
2. A siding permit to remove and replace the metal siding along the top of the exterior walls.

Two inspections by the building department would be necessary to confirm the flashing was attached properly and that the self-adhered membrane flashing strip was properly adhered to the EPDM membrane. The City of Lakewood Building Department also stated the issuance of a roof permit did not trigger any additional work related to the existing roof and further did not require that the existing roof be removed and/or replaced to comply with the code requirements for a new EPDM/thermoset roof membrane or to the current insulation standards of the IECC. Finally, the City of Lakewood Building Department stated the components of the roof that would be required to meet the current 2015 code requirements would be limited to the parts of the roof being repaired, i.e. the drip edge flashing.

The City of Lakewood plans examiners also confirmed a separate siding permit would be required to remove and replace the metal siding along the top of the exterior walls. However, permit(s) would not be required for any painting or removal/replacement of doors/windows as this type of work is exempt from a permit.

**HISTORIC WEATHER DATA and HAIL DISCUSSION**

The May 8, 2017, Denver hailstorm was classified as a catastrophic event. Hailstones between 1.0- and 2.75-inches in diameter were recorded in Golden, Lakewood, Arvada, Wheat Ridge, and Denver, Colorado on the afternoon of May 8, 2017. Our office has conducted hail evaluation services for dozens of claims related to the May 8, 2017, hailstorm event including hundreds of different roofs and various roof types including a property located four blocks south of the Jamis location.

Our office utilized the historic weather data provided by the Community Collaborative Rain, Hail, and Snow Network (CoCoRaHS), the Storm Prediction Center and the Storm Events Database as a part of the National Oceanic and Atmospheric Administration (NOAA), and other web-based historic hail services such as Hail-Reports.com and CoreLogic. The most beneficial weather data for our investigation are weather reports of documented hailstone sizes that were reported by first person accounts of hailstones measured on the ground versus estimated hailstone size generated via radar signatures. We then correlate our observations of hailstone impacts at the site to the weather data to identify the likely approximate size and directionality of the hailstones that have fallen at the property over time.

NOAA's May 8, 2017, Storm Events Database reported hailstones of 2.5-inches in diameter located approximately 0.9 miles to the southeast of the site. The closest CoCoRaHS weather station to report hailstones on May 8, 2017, was CO-JF-3, located approximately 3.0 miles to the southwest of the site, which reported 1.0-inch diameter hailstones on the ground. Based on the evidence at the site it is our opinion the NOAA report of 2.5-inch diameter hail located 0.9 miles to the southeast was not representative of the hailstones that fell at the Jamis location. We compiled the NOAA and CoCoRaHS historic weather data onto maps included with our weather research under Appendix A.

Based on our experience with this storm, the results of our weather research, and our evaluation of the Jamis property it is our opinion hail fell at the property on the date of loss with a predominately south-southwest to east-northeast fall direction/trajectory. The largest hailstones were approximately 1.5- to 1.75-inches in diameter and primarily impacted the west-facing components of the structure and the roof, and secondarily the south-facing components of the structure. Due to the directionality of the hailstone fall direction, the east- and north-facing components of the structure were not impacted by hailstones on May 8, 2017.

**OBSERVATIONS AND FINDINGS**

As a part of our hail investigation we closely examined the exposed building components that were more susceptible to effects of hailstone impacts, such as the light gauge sheet metal, painted exterior walls, and air conditioning condensing fins. We further evaluated the more durable building materials at the property, such as the steel window frames and roof coverings (EPDM, asphalt composition shingles, and modified bitumen). The culmination of evidence from our evaluation of these components at the site provides the necessary information to determine the likely hailstone size(s), fall direction, and whether any of the building components were affected by hailstones during their service life and on the date of loss.

Our evaluation revealed the subject structure has been impacted by hailstones several times over the years of service. For example, the paint coating at the south- and east-facing window sills exhibited fractures due to hailstone impacts, which were created by at least two different storms. Similarly, the rooftop light gauge vents were indented on all sides from storms with hailfall directions from a variety of directions. Specific to the May 8, 2017, event, any indentations on west-facing components and the roof could be related to the date of loss. Since our evaluation of the building was almost three years after the event, the effects of hailstone impacts to many of the building materials have faded over time. Examples of hailstone impact affects that were likely created on May 8, 2017, are shown below:



20.01.22 JEA 40 shows indentations in the aluminum air conditioning condensing fins (south).



20.01.22 JEA 49 shows fractured/chipped paint on the window sill (south).



20.01.22 JEA 83 shows indentations in the west-facing aluminum siding (west).




20.01.22 JEA 105 shows fractures through the unsupported shingles on the shed roof (west).



CSI Photo 84 showing an indentation in the bottom flange of the drip edge flashing.




20.01.22 JEA 186 showing multiple hailstone impacts to a light gauge B-vent.

Conversely, some building components exhibited only evidence of spatter created by a hailstone impact that removed surface oxidation, dust/dirt, or grime, or, some components such as the EPDM membrane itself exhibited no evidence of hailstone impacts.



20.01.22 JEA 54 shows spatter on the south-facing garage door created after the date of loss.




20.01.21 JEA 78 shows older/faded and newer /darker spatter marks at a electrical panel (west).



20.01.22 JEA 201 shows an unaffected metal vent



20.01.22 JEA 169 shows the unaffected EPDM.

We further observed widespread evidence of a lack of routine maintenance and/or mechanical impacts from objects other than hail.




20.01.22 JEA 131 shows deteriorated glazing putty at an unaffected window (north).




20.01.22 JEA 65 shows mechanical damage likely from car bumpers at a south overhead door.

We observed exposed components of the property that sustained physical alterations caused by the force of hailstone impacts on May 8, 2017, included the following, which we included in our cost of repair estimate under Appendix B:

1. The south-facing paint on the exterior brick walls and OSB opening cover.
2. The south- and west-facing drip edge flashing around the edge of the roof.
3. The south- and west-facing aluminum siding along the top of the exterior walls.
4. The light-gauge sheet metal rooftop vents.
5. The exterior light housing (south).
6. An exterior microphone (removed after the date of loss and not observed during our evaluation).
7. The three-tab asphalt composition shingles at the attached shed.
8. The modified bitumen roof membrane at the rooftop housing.
9. The pressboard siding at the west shed.
10. The illuminated tenant/monument sign on Sheridan Boulevard.

Initially, CSI, on behalf of Owners Insurance, submitted a cost of repair estimate on June 28, 2017, for $16,934, which aligned more closely with our evaluation. CSI's repairs included the first 9 items we listed above and also added several items that we do not attribute to the May 8, 2017 event, including:

A. Paint at the east exterior brick wall,
B. Remove/replace a junction box and electrical outlet (east),
C. Paint the aluminum siding on the east exterior wall,
D. Remove/replace the siding at the north exterior wall,
E. Re-glazing a fractured window pane (south),
F. Replacing the garage door weatherstripping (south),
G. Paint the overhead garage door (south),
H. And, replacing the drip edge flashing around the edge of the roof (all sides), which included a three-foot wide strip of EPDM to remove and replace the indented drip edge flashing.

Chronologically, UB Code Roofing, on behalf of the property owner, submitted a cost of repair estimate on January 10, 2018, for $24,239 that only included the roof coverings and associated accessories. Some of the items in UB Code Roofing's estimate aligned with our scope including the modified bitumen roof, asphalt composition shingles, and drip edge flashing (only on the south and west sides). However, UB Code Roofing's scope included a complete removal and replacement of the EPDM roof membrane including the labor to remove the roof, a new EPDM membrane, and new insulation board under the membrane. UB Code Roofing did not provide an evaluation of the existing roof or justification for this scope of repair. UB Code Roofing also did not include any components of the structure below the roof that were impacted by hailstones, such as the paint, aluminum siding, or shed siding.

Next, ECO Roof and Solar (ECO) submitted an estimate to repair the effects of hailstone impacts at the property on March 21, 2018, for $126,383. ECO's estimate greatly expanded the scope of the repairs to the roof not only to include removing and replacing the EPDM membrane, but also to make the roof code compliant with the currently adopted codes by the City of Lakewood Building Department (2009 IBC at the time). To make the roof code compliant for a new roof, ECO added 3 1/2 inches of polyisocyanurate rigid insulation to cover the interior space to meet the IECC, up to four additional inches of tapered insulation to create slope for the roof membrane to meet the positive drainage requirements in the IBC, as well as a fire retardant gypsum board (cover board) to meet the IBC. The added thickness from the rigid and tapered insulation and cover board created the need to add wood framing around the perimeter of the roof for a nailable surface for the drip edge flashing. These components alone accounted for $78,471 of their estimate.

ECO sent a revised estimate one week later on March 28, 2018, for $105,259, which removed Line Item Nos. 3 and 4 from their March 21 estimate including 3,900 square feet of 2-inch thick rigid insulation ($11,574) and 1 1/2-inch thick rigid insulation board ($9,549).

Similar to UB Code Roofing, ECO did not provide an evaluation of the roof assembly, any discussion about how or why the EPDM roof membrane justified removal and replacement. Further neither contractor addressed reasons why the Lakewood Building Department would require the roof assembly be brought up to the 2009 IBC and IECC standards for a new roof. ECO only included line item descriptions stating the current/applicable codes for a new roof in the City of Lakewood, such as insulation R-value and slope requirements.

CSI then revised their scope and cost of repair estimate on June 28, 2018, to add General Conditions and the illuminated tenant/monument sign. These additions increased their cost of repair to $24,789.

Lastly, Pivot Adjusters developed their cost of repair estimate on April 30, 2019, for $136,167. The increased costs were primarily related to their General Conditions ($23,723) and the code-required upgrades to make the roof compliant with a newly installed roof ($62,039). Pivot Adjusters included 75 captioned photographs within their estimate describing the conditions at the property on April 5, 2019. We disagree with ECO Roof and Solar and Pivot Adjusters that the following items were affected by hailstones on May 8, 2017, and we provide an evaluation of those items below:

EPDM Membrane – Pivot Adjusters' Photographs 10 through 16

Pivot Adjusters, ECO Roof and Solar, or UB Code Roofing does not describe or state that the EPDM membrane was damaged by hailstones on May 8, 2017. Pivot Adjusters described the uneven surface of the EPDM membrane as "stripling", which we researched and could not correlate an applicable meaning to an EPDM roof, and a corresponding divot in the supporting sheathing under the EPDM.

ECO Roof and Solar's estimate stated "the following line items are to account for positive drainage. This roof has evidence of ponding water, and the city of lakewood (sic) does require positive drainage."

It is our opinion that repairs to roof coverings due to affects of hailstone impacts are justified when either the water shedding ability of the membrane has been reduced, and/or there has been a reduction in the expected long-term service life of the roof material. With regard to EPDM membranes, hailstone spatter marks are not considered a condition that requires a repair; however, a fracture or splits through the EPDM membrane that are observable in the top or bottom side of the membrane are considered conditions that warrant membrane replacement. Manufacturer's defects, mechanical impacts, a lack of routine maintenance, and natural weathering of the product are not considered damage related to a hailstorm event.

Specific to EPDM, it is our experience, as well as test data published by other engineering research laboratories that evaluate hail, indicate the hailstone threshold size required to fracture and/or split 45 mil unreinforced EPDM membrane is approximately 2-1/2 inches or larger in diameter, depending on the age of the membrane and the substrate directly below the membrane sheet. Due to the elastic properties of EPDM, these membranes can typically stretch to absorb severe hailstone impacts (hailstones of 1.0-inches in diameter or larger as defined by the National Weather Service) without puncturing, tearing, or rupturing. Since the EPDM membrane at the Jamis property was a 60 mil product, the hailstone size required to create a fracture or split would be larger than that for a 45 mil membrane.

We evaluated the top surface of the EPDM membrane, which was in good condition. More specifically, adhered EPDM membranes are most susceptible to fractures/tears by hailstone impacts where the membrane is not evenly supported or over underlying fastener plates. We observed the EPDM membrane at the Jamis property was uniformly and evenly supported, which makes the membrane more durable and resistant to impact damage from any object. We closely evaluated the EPDM over the fastener plates as well, which was also in good condition. Therefore, it is our opinion, the EPDM membrane was not affected by hailstone impacts on May 8, 2017, nor during its service life.

| | |
|---|---|
|  |  |
| 20.01.22 JEA 176 shows the EPDM membrane was in good condition over a fastener plate. | 20.01.22 JEA 182 shows the EPDM membrane was in good condition over a fastener plate. |

It appears Pivot Adjusters and ECO Roof and Solar included the costs to remove and replace the EPDM roof membrane to provide a new roof compliant with the current building codes for slope/drainage and insulation simply because a roof permit was required by the City of Lakewood, not because the EPDM membrane was actually damaged by hailstone impacts on May 8, 2017.

Aluminum Siding Panels – East and North Exterior Walls

Pivot Adjusters' photographs of the aluminum siding on the north (photos 41 through 43) and east exterior walls (Photo 45 and 47) show mechanical damage in the form of fastener holes or paint scuffs, which we also observed. Based on our observations and experience with the May 8, 2017, storm event, which align with Pivot Adjusters' photographs, the east- and north-facing components of the structure, including the aluminum siding panels, were not affected by hailstones. We disagree with Pivot Adjusters' and ECO Roof and Solar's inclusion of these items within their cost of repair to address hail-affected components of the property.

| | |
|---|---|
|  |  |
| 20.01.22 JEA 147 shows a fastener hole in the metal siding (north), also shown in Pivot Photo 43. | 20.01.22 JEA 15 shows paint scuffs and fastener holes in the metal siding (east), which matches Pivot Photo 47. |

Code Upgrades – Roof Assembly, Tapered Rigid Insulation

We agree with ECO Roof and Solar that the existing Jamis roof was installed without code-compliant slope to drain. Widespread areas of dirt/debris were observed throughout the roof membrane that are representative of ponded water conditions. By utilizing a digital level we confirmed the roof membrane was not installed with consistent slope to drain water off the roof membrane, but instead the roof membrane slopes a variety of directions, sometimes toward the edge, sometimes away from the edge.

The 2009 IBC, which, per the owner, was likely applicable when the existing roof was installed, included the following excerpt about the slope of membranes for a re-roof project:

> "1510.1 General. Materials and method sof application used for recovering or replacin gan existing roof covering shall comply with the requirements of Chapter 15.
>
>> Exception: Reroofing shall not be required to meet the minium design slope requirement of one-quareter unit vertical in 12 units horizontal (2-percent slope) in Section 1507 for roofs that provide positive roof drainage." (emphasis added)

Case No. 1:19-cv-01768-SKC Document 25-2 filed 06/29/20 USDC Colorado pg 13 of 18



The above-referenced exception may have been utilized by the City of Lakewood during inspection of the existing roof for justification to allow the lack of positive slope issue. It is also possible the existing roof was installed without a permit; therefore, the City of Lakewood was not privy to the installation methods and exisiting condition of the roof.

It is our opinion the lack of consistent positive slope on the EPDM membrane was not created by a weather event, or a hailstorm that occurred on May 8, 2017; therefore, although we do not support installing a roof without positive slope to drain, we do not recommend this condition at the Jamis property be repaired related to the May 8, 2017, hailstorm event. It appears Pivot Adjusters' and ECO Roof and Solar's estimate for tapered insulation was included to make the roof code compliant with respect to slope, but was not included to address hailstone impact damage to the EPDM membrane.

| | |
|---|---|
|  |  |
| 20.01.22 JEA 198 shows areas of ponding water throughout the roof surface. | 20.01.22 JEA 209 shows stains on the surface of the EPDM due to repeated ponding water. |

<u>Code Upgrades – Roof Assembly, Increased Roof Insulation</u>
Similar to the tapered insulation/slope issue above, Pivot Adusters and ECO Roof and Solar added polyisocyanurate rigid insulation boards over the entire roof area to provide an IECC code-compliant amount of insulation. The additional insulation was further justification for removal and replacement of the EPDM membrane. We agree the 2009 IECC required R-20ci within table 502.2(1) when insulation is provided entirely above the roof deck. However, it is our opinion this requirement was not applicable at the Jamis property since, per the City of Lakewood Building Department, repairs can be conducted to commercial roofs without triggering compliance with the currently-adopted building codes. Therefore, it is further our opinion Pivot Adjusters' and ECO Roof and Solar's estimates that included new roof insulation were misleading and were not an accurate assessment of the City of Lakewood Building Department requirements.

The following are excerpts from the Complaint, wich our responses after each allegation.

**Complaint Item No. 22:**

> *The IBC required that new roof coverings, such as EPDM, shall not be installed without first removing all existing layers of roof coverings to the roof deck.*

J.S. Held Response to Complaint Item No. 22:
Section 1510.3 of the 2009 IBC stated:

> "1510.3 Recovering versus replacmenet. New roof coverings shall not be installed without first removing all existing layers of roof coverings down to the roof deck where any of the following conditions occur:
>
> 1. Where the existing roof or roof covering is water soaked or has deteriorated to the point that the existing roof or roof covering is not adequate as a base for additional roofing.
> 2. Where the existin groof covering is wood shake, slate, clay, cement or asbestor-cement tile.
> 3. Where the existing roof has two or more application of any type of roof covering."

The statement in Complaint Item No. 22 is misleading in that it reads as if roof coverings, including EPDM membranes, are not allowed to be installed over a previously-existing roof covering and must always be installed over the existing roof deck/sheathing. Generically, the building code allows two roof coverings; therefore, as an independent concept, Complaint Item No. 22 is not correct since an EPDM membrane can be installed over a previously-existing roof. As it relates specifically to the Jamis roof, it is likely that the existing roof assembly includes two roofs; the EPDM membrane, and a previously-existing membrane. Therefore, we agree conceptually that, if the EPDM membrane at the Jamis property justified replacement due to hailstone impacts created on May 8, 2017, and there is a second roof system beneath the existing EPDM membrane, that removing all of the existing roof layers would be required by the building code and the City of Lakewood Building Department. However, since UB Code Roofing, ECO Roof and Solar, Pivot Adjusters and our evaluation concluded that the existing EPDM membrane was not damaged by hailstone impacts, then it is further our opinion removal of the EPDM membrane is not required.

**Complaint Item No. 23:**

*Owners' repair estimate does not provide a legally compliant repair methodology.*

J.S. Held Response to Complaint Item No. 23:
We agree the galvanized drip edge flashing on the south and west sides of the roof/exteiror wall were indented by hailstone impacts on May 8, 2017. Since the indentations cannot be removed, replacment of the drip edge flashing would be the only reasonable solution to return the flashing to the condition it was in prior to the date of loss event. Our repair methodology includes removing the self-adhered strip flashing over the horizontal leg of the drip edge, which exposes the fasteners used to attach the drip edge to the underlying structure. Once exposed, the fasteners can be removed, along with the drip edge flashing itself. Then, new flashing can be installed, fastened to the structure, and a new strip of self-adhered membrane applied over the flashing sealing it to the existing, undamaged, EPDM membrane.

Owners'/CSI's repair methodology to repair the same indented drip edge flashing included cutting the EPDM back approximately three feet, installing a new drip edge, installing a new EPDM patch/strip around the permiter of the roof, and sealing the new EPDM strip to the existing EPDM membrane. Although this is one approach, based on our experience, it is our opinion the indented drip edge flashing can be removed and replaced a variety of ways including without modification to the exisitng EPDM membrane.

Regardless of which repair is followed, both repair methods would require a roof permit from the City of Lakewood Building Department, which the City of Lakewood commercial plans examiners indicated would be an application they would approve. However, neither method would require the entire roof assembly be removed and replaced with a new roof that complies with the current IECC and IBC requirements for a thermoset/EPDM roof membrane as stated by the City of Lakewood plans examiners. Therefore, it is our opinion the Owners'/CSI's repair methodology was and remains legally compliant.

**Complaint Item No. 24:**

*Owners' proposed repair methodology does not adhere to construction industry standards.*

J.S. Held Response to Complaint Item No. 24:

Based on our evaluation of the UB Code Roofing, ECO Roof and Solar, and Pivot Adjusters documents, we did not find a discussion regarding how Owners'/CSI's recommended repair deviates from construction industry standards. It is our experience removing and replacing flashing components on a commercial roof can be conducted as a part of normal property maintenance or to address weather related damage to the property. Further, based on our conversation with the City of Lakewood Building Department plans examiners, it is our opinion our recommended repairs are constructable and would be inspected by the Building Department for compliance with industry standards. Therefore, we disagree with Complaint Item No. 24 that Owners'/CSI's, or our recommended repairs do not adhere to construction industry standards.

One recognized industry standard is the National Roofing Contractors Asssociation (NRCA), which produced several industry-accepted manuals related to the installation, repair, and maintenance of roof coverings. The 2017 Repair Manual for Low-Slope Membrane Roof Systems, published by the NRCA (among other roof industry associations), includes the following statement related to repairing roof flashing:

> "The primary purpose of maintenance and repairs for roof systems is to extend the roof's service life…so as to prolong and enhance the original investment made in the roof system."
>
> "Spot patching simply involves the installation of patches to repair isolated deficient or degraded locations in the membrane or flashing – thereby extending the membrane's service life." (page vii)

**Complaint Item No. 25:**

*Owners' repair estimates only account for removing 3 feet of the EPDM roof around the permiter and installing new EPDM roof around that perimeter. Accordingly, Owners' repairs estimates do not allow for "removal of all existing layers of roof covering down to the roof deck," as required by the applicable building code.*

J.S. Held Response to Complaint Item No. 25:

As previously discussed, the applicable building code did not require the removal of all existing layers of the roof covering down to the roof deck to conduct the repairs proposed by Owners or CSI or J.S. Held. Therefore, we disagree with Complaint Item No. 25.

**Complaint Item No. 27:**

*Upon information and belief, no code official with the City of Lakewood would approve the repairs to the EPDM roof outlined by Owners.*

J.S. Held Response to Complaint Item No. 27:
As previously discussed, the City of Lakewood Building Department, via our conversation with two commercial plans examiners, do approve of the repairs to the Jamis roof, whether the EPDM membrane is cut three feet around the perimeter as proposed by Owners/CSI or by simply replacing the drip edge flashing as we recommend. Therefore, we disagree with Complaint Item No. 27.

**Complaint Item No. 28:**

*No manufacturer of roofing materials would approve or authorize the repairs specified in Owners repair estimates for the EPDM roof.*

J.S. Held Response to Complaint Item No. 28:
Based on our evaluation of the UB Code Roofing, ECO Roof and Solar, and Pivot Adjusters documents, we did not find a discussion regarding how Owners'/CSI's recommended repair deviates from EPDM membrane manufacturer approvals. Specific to our recommended repair methodology this issue becomes pointless since the component(s) of the roof that were indented by hailstones (south- and west-facing drip edge flashings) can be removed and replaced without modification to the EPDM membrane. Specific to the Owners/CSI methodology, it is our experience splicing new sheets of EPDM membrane into an existing EPDM roof is common practice. We included the NRCA repair protocol for EPDM Laps and Splices Repair with tape and the Metal Edge Flashing (Gravel Stop) Loose flashing membrane: Repair with tape under Appendix C for reference on industry standard repair practices applicable to either Owners'/CSI's or our repair scope.

**Complaint Item No. 29:**

*Upon information and belief, the EPDM is damaged by hail and required replacement.*

J.S. Held Response to Complaint Item No. 29:
Based on our evaluation of the UB Code Roofing, ECO Roof and Solar, and Pivot Adjusters documents, we did not find a discussion regarding damage to the EPDM membrane. Based on our evaluation, the EPDM membrane was in good condition. Further, the hailstone size was smaller than the threshold size to fracture a well supported 60 mil adhered EPDM membrane. Therefore, we disagree with Complaint Item No. 29.

During his January 28, 2020, deposition, Mr. Soneff (the property owner), stated there were two roof leaks. One leak was investigated recently by UB Code Roofing and determined to not be related to the May 8, 2017, hailstorm event (page 16, line 21). Mr. Soneff described another leak that occurred after May 8, 2017, that UB Code Roofing did conduct a repair for, but he was unclear when the repair occurred or where it was located on the roof. We observed the EPDM membrane at the wood-framed housing on the west side of the roof was not watertight. We observed gaps in flashings, a possible repair, and that the membrane was not sealed to the walls. Any or all of these conditions could contribute to a leak into the interior of the building, but in our opinion, were related to the original installation methods of the membrane and were not related to a one-time hail event on May 8, 2017.

|  |  |
| --- | --- |
| 20.01.22 DH 46 shows an open seam in the EPDM near the west housing. | 20.01.22 DH 49 shows the top edge of the EPDM membrane was loose/not water tight. |

**J.S. HELD COST OF REPAIR ESTIMATE**

Our cost of repair estimate is included under Appendix B for our scope of repairs. The J.S. Held cost of repair estimate is $12,811. It is our opinion our repair scope will return the property to the condition it was, or better, on May 7, 2017, which addresses the components of the structure that were affected by hailstone impacts on the afternoon of May 8, 2017. It is further our opinion the cost of repairs submitted by Owners/CSI were appropriate to address the components of the property that were affected by hail on the date of loss.

**SUMMARY AND CONCLUSIONS**

A historic hailstorm event occurred on the west side of the Denver Metropolitan Area on the afternoon of May 8, 2017. The Jamis property located at 775 Sheridan Boulevard in Lakewood, Colorado was impacted by hailstones of approximately 1.5- to 1.75-inches in diameter that primarily impacted the west-facing side of the structure and the roof. The hailstones fell with sufficient force to indent several sheet metal components on the building including roof flashing and vents, chip paint, fracture unsupported asphalt composition shingles, and indent the aluminum siding. However, due to the elastic properties of EPDM roof membranes, the well supported 60 mil membrane at the Jamis property was not affected by the hailstone impacts.

We recommended the components of the property that were visible and indented be removed and replaced. The drip edge flashing of the roof can be removed and replaced without any modifications to the EPDM membrane or could be removed and replaced with a narrow strip of EPDM sealed to the existing membrane as originally proposed by Owners/CSI. Both repair options follow industry recognized repair methodologies.

The roof drip edge and siding repairs will require separate permits from the City of Lakewood Building Department. The roof flashing permit will not trigger more widespread repairs to the roof as alleged by ECO Roof and Solar or Pivot Adjusters, which was confirmed via in-person meeting with commercial plans examiners with the City of Lakewood Building Department. It is our opinion ECO Roof and Solar's and Pivot Adjusters' repair scope to include removal and replacement of the entire roof assembly down to the existing deck and be replaced with a roof to meet the current code-requirements for a new roof were misleading, inaccurate, and were not necessary to return the Jamis property to the condition it was on May 7, 2017. Further, ECO Roof and Solar and Pivot Adjusters included components of the property that were not affected by hailstone impacts due to directionality of the storm event within their repair estimate.

ECO Roof and Solar's and Pivot Adjusters' repair estimates varied between approximately $105,000 to $136,000, whereas our repair estimate was $12,811, which more closely aligned with CSI's initial estimate of $16,934 prepared approximately six weeks after the storm event.

**CLOSING**

Thank you for the opportunity to provide professional services. The opinions and conclusions in this report have been formulated within a reasonable degree of professional certainty. Please note that J.S. Held opinions are based on the information provided and/or obtained as well as our training, knowledge and experience. To the extent that hidden conditions exist, and/or additional information is made available, J.S. Held reserves the right to revise or update any of the observations, assessments, and/or opinions as conditions change or additional information is provided for our review.

This document is to inure to the benefit of the addressee only and may not be relied upon, used by, or referenced by any third party without the written consent of J.S. Held. If clarification or additional information is required, please do not hesitate to contact us.

Respectfully,
**J.S. Held LLC**




Jeffrey E. Anderson, AIA, LEED AP
Professional Architect I
Colorado License No. ARC 400595 (Expires 10/31/21)

Appendixes: (A) – Historic Weather Data
(B) – J.S. Held Cost of Repair Estimate
(C) – Industry Standard/NRCA Repair Protocols and Drip Edge Detail
(D) – J.S. Held Photographs (under separate cover)